**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

MUCTARU COKER,

        Plaintiff,

vs.

PARKER HANNIFIN CORPORATION,

        Defendant.

No. 13-CV-6-LRR

**ORDER**

---

*TABLE OF CONTENTS*

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   SUBJECT MATTER JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   SUMMARY JUDGMENT STANDARD. . . . . . . . . . . . . . . . . . . . . . . 4

V.     FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.     Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     B.     Coker's Employment at Parker Prior to the Dispute at Issue. . . . . . . 5
          1.     Reviews. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
          2.     Errors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          3.     Attendance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          4.     Wasting time. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
          5.     Unsafe work practices. . . . . . . . . . . . . . . . . . . . . . . . . 7
          6.     Other misconduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
          7.     Sexual harassment complaint. . . . . . . . . . . . . . . . . . . . 8
     C.     Coker's Relationship with R.Y.. . . . . . . . . . . . . . . . . . . . . . . . 9
     D.     R.Y.'s Sexual Harassment Complaint. . . . . . . . . . . . . . . . . . . 9
     E.     Coker's Voicemail to R.Y. . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     F.     Coker's Termination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
     G.     Coker's Knowledge of Parker's Policies. . . . . . . . . . . . . . . . . 15
     H.     Coker's Complaint to Iowa Civil Rights Commission ("ICRC"). . . . 16

VI.   ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      *A.*     *Title VII.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
           *1.*     *Legitimate, nondiscriminatory reason.* . . . . . . . . . . . . . . . . . **18**
                *a.*     *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . . . . **18**
                *b.*     *Applicable law..* . . . . . . . . . . . . . . . . . . . . . . . . . **18**
                *c.*     *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**
           *2.*     *Pretext.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**
                *a.*     *Was there a basis in fact for the proffered explanation?.* **20**
                *b.*     *Did a prohibited reason more likely*
                      *motivate the employer?.* . . . . . . . . . . . . . . . . . . . . . **22**
                      *I.*     *Parties' arguments.* . . . . . . . . . . . . . . . . . . . **22**
                      *ii.*     *Applicable law and application..* . . . . . . . . . . . . **23**
                          *(1)*     *Comparators.* . . . . . . . . . . . . . . . . . . . . **23**
                          *(2)*     *Shifting explanation.* . . . . . . . . . . . . . . . **25**
                          *(3)*     *Other evidence of discrimination.* . . . . . . . **26**
      *B.*  *ICRA Claim.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

**VII.**     *CONCLUSION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

## I. INTRODUCTION

The matter before the court is Defendant Parker Hannifin Corporation's ("Parker") Motion for Summary Judgment ("Motion") (docket no. 13).

## II. PROCEDURAL BACKGROUND

On December 27, 2012, Plaintiff Muctaru Coker filed a two-count Petition ("Complaint") (docket no. 4) in the Iowa District Court for Linn County, Case No. LACV77420. In the Complaint, Coker alleges that Parker wrongfully terminated him because of his race and national origin in violation of the Iowa Civil Rights Act, codified in pertinent part at Iowa Code section 216.11, and Title VII of the Civil Rights Act of 1964, codified in pertinent part at 42 U.S.C. § 2000e-2. On January 29, 2013, Parker removed the action to this court on the basis of federal question and diversity jurisdiction. Notice of Removal (docket no. 2). On May 29, 2014, Parker filed the Motion. On June 23, 2014, Coker filed a Resistance (docket no. 14). On June 30, 2014, Parker filed a Reply (docket no. 15). Neither party has requested oral argument and the court finds that oral argument is unnecessary. The Motion is fully submitted and ready for decision.

## III.  SUBJECT MATTER JURISDICTION

The court has federal question jurisdiction over Coker's claim that Parker violated 42 U.S.C. § 2000e-2.  *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  Since the court has federal question jurisdiction over Coker's claim pursuant to 42 U.S.C. § 2000e-2, the court has supplemental jurisdiction over Coker's claim arising under Iowa Code section 216.11, because the claim "form[s] part of the same case or controversy" as Coker's federal claim.  *See* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

The court also has diversity jurisdiction over Coker's claims against Parker pursuant to 28 U.S.C. § 1332(a).  Coker is a citizen of Iowa.  Complaint ¶ 2.  Parker is an Ohio corporation with its principal place of business in Cleveland, Ohio, and therefore, an Ohio citizen.  Notice of Removal ¶ 9.  The Complaint does not allege an amount in controversy, but based on statements in the Notice of Removal and the fact that Coker has not resisted the removal of this case to federal court, the court is satisfied that the amount in controversy exceeds $75,000.  *See* Notice of Removal ¶¶ 11-15.  Accordingly, there is complete diversity of the parties and the amount in controversy exceeds $75,000. Therefore, the court finds that it has diversity jurisdiction over both of Coker's claims. *See* 28 U.S.C. § 1332(a) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States.").

## IV.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). "[U]nsupported, self-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r of Internal Revenue*, 614 F.3d 799, 807 (8th Cir. 2010).  "To survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second alteration in original) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)) (internal quotation marks omitted).  If there is a genuine dispute about a material fact, the court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* at 586 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted).

"The [Supreme] Court has reiterated that district courts should not 'treat discrimination differently from other ultimate questions of fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).  "There is no 'discrimination case

exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Id*.

## V. FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Coker and affording him all reasonable inferences, the facts are these:

### A. Parties

Coker was born in Gambia, Africa, and considers his ethnicity African and national origin Gambian. Coker's native language is not English. In late 2004, Coker was assigned by Kelly Services, a temporary staffing agency, to work at Parker's Hiawatha, Iowa plant. While a temporary worker, Coker submitted an application for a full-time position to Steve Point, Parker's warehouse supervisor in Hiawatha. Brian Odean, Parker's plant manager, hired Coker to a full-time position as an assembly worker and material handler. Point was Coker's supervisor throughout Coker's employment at Parker.

Parker is responsible for the design, manufacture and marketing of a variety of applications that control the flow of fluids in various markets, such as aerospace, agriculture, construction and industrial areas. Parker's plant in Hiawatha produces hoses and fittings for hydraulics. Assembly workers at the Hiawatha plant work in one of six cell work stations and often rotate through the cells. Material handlers move inventory with a forklift or their hands from the dock area to trucks for shipping or from trucks to the dock area to be used by the plant. Material handlers also verify the inventory received matches the same materials listed on the packing slip.

### B. Coker's Employment at Parker Prior to the Dispute at Issue

#### 1. Reviews

Point reviewed Coker's work numerous times from 2005 until the end of Coker's employment at Parker. Coker generally received high ratings in most of the categories and he received a wage increase in most years. However, Coker also received several negative

reviews.  On May 16, 2011, Point conducted a quarterly one-on-one evaluation with Coker.  Point noted that Coker needed to manage his time better and to avoid distractions, nonproductive conversations and cell phone use.  On July 19, 2011, Coker received an annual performance review.  The review listed mostly positive attributes about Coker's work but also stated that Coker needed to improve his dependability and avoid nonproductive conversations.  On December 12, 2011, Point indicated to Coker in a quarterly one-on-one evaluation that Coker needed to manage his time better on the production floor, focus on his work and avoid distractions and nonproductive conversations.  Coker acknowledged that he understood the comments made during the one-on-one evaluations.

### 2. *Errors*

Parker disciplined Coker for various errors committed at Parker.  On April 25, 2005, Parker issued Coker a counseling because he committed three quality-related errors from January 28, 2005 to April 13, 2005.  On February 8, 2006, Parker issued Coker a second counseling for committing seven quality-related errors in a twelve-month period.  On April 10, 2006, Parker issued Coker a verbal warning for committing three quality-related errors from April 13, 2005 to March 20, 2006, for a total of ten errors in a rolling twelve-month period.  Finally, on August 30, 2011, Parker issued Coker a counseling for committing three quality-related errors in a rolling twelve-month period.

### 3. *Attendance*

On December 21, 2010, Parker issued Coker a written attendance warning for six attendance points for taking an extra six days off of work to visit Africa.[1]

---

[1] The parties agree that Coker received a written warning and five attendance points on December 21, 2010 for taking an extra six days off of work.  However, the record indicates that Coker received six attendance points.  On December 21, 2010, Coker received a verbal warning and five attendance points.  Attendance Warning, Parker

(continued…)

6

#### 4.    Wasting time

On June 16, 2011, Parker issued Coker a counseling for wasting time and leaving the work area during work hours to have nonproductive social conversations with co-workers.  On August 30, 2011, Parker issued Coker a verbal warning for unnecessary wandering, wasting time, having nonproductive conversations and for not maintaining a consistent productivity level.  Notice of Unacceptable Performance, Parker App'x at 200.

#### 5.    Unsafe work practices

On October 6, 2005, Parker issued Coker a counseling for unsafe work practices after he struck a water fountain while operating a forklift.

#### 6.    Other misconduct

On September 13, 2006, Parker issued Coker a counseling for workplace violence after he raised his voice toward another employee in a nonprofessional manner.

On May 22, 2007, Coker was involved in a verbal altercation with his lead person, D.P., a white male, after D.P. told Coker to remain productive.  Coker became angry with D.P. and said, "I'm tired of your shit and I'm not going to take it anymore!"  Verbal Reminder, Parker App'x at 196.  Coker was notified that his behavior was considered insubordination and unacceptable under Parker's Workplace Violence Policy.  Coker acknowledged that he must follow the directives of the lead person, must communicate in a professional way and that outbursts would not be tolerated at Parker.

---

[1](…continued)
Appendix ("Parker App'x") (docket nos. 13-3 through 13-4) at 197.  The record further indicates that on December 22, 2010, Coker received a written warning and an additional attendance point.  Attendance Warning, Parker App'x at 198. Coker signed both forms on February 11, 2011, and states that he received six attendance points. Coker Deposition, Parker App'x at 110.

## 7.      *Sexual harassment complaint*

On March 20, 2008, Parker issued Coker a warning and a one day/partial day off with pay for inappropriate sexual conduct in the workplace toward S.J., a female co-worker.  The warning detailed Coker's inappropriate sexual conduct toward S.J.:

> With this notification, you are now in a very serious and critical position relative to your continued employment at Parker.
>
> The performance/behavior standards at issue are:
>
> On Dec. 13, [2007,] you were telling co-workers that you had slept with a female co-worker and kept pushing the issue.  On Dec. 14[, 2007,] you asked [the] same co-worker why she was feeling her tits (which her shirt was dirty) then asked twice if her tits were real.  Then you said that they were nice.  Then you tried to have [a] co-worker join in your inappropriate discussion of [the] female co-worker[']s anatomy.[2]
>
> . . . .
>
> . . . Violation of Sexual Harassment Policy going forward will result in Termination.

Decision-Making Time Off Notification, Parker App'x at 180.  Coker admitted he made repeated comments to S.J. about her "tits," including asking her why she was "feeling her tits," asking her if her "tits were real" and telling her that her "tits" were "nice."  Coker Deposition, Parker App'x at 63-64, 98.  Point described the incident as a couple guys "razzing" and "giving a hard time" to S.J.  Point Deposition, Coker Appendix ("Coker App'x") (docket nos. 14-4 through 14-5) at 67.  Yet, Coker understood that Parker was treating the incident as a serious issue and that he could lose his job because of the

---

[2] The parties agree that the warning dates listed are incorrect and should read March 13 and 14, 2007, rather than December 13 and 14, 2007.

incident. Coker was neither terminated for this incident nor ordered to undergo treatment. Coker received several positive performance reviews after this incident.

### C. Coker's Relationship with R.Y.

Coker first met and worked with R.Y., a white female, at Parker in 2004. Coker, R.Y. and their spouses went out as couples. At some point, a sexual relationship developed between Coker and R.Y. while both were employed at Parker. The relationship mutually ended in 2010.

### D. R.Y.'s Sexual Harassment Complaint

On April 17, 2012, R.Y. filed a sexual harassment complaint with Parker management concerning J.M., a black temporary worker at Parker. R.Y. told Point that J.M. had grabbed her butt, asked if she was constipated, mouthed "I love you" to her and intentionally prevented her from exiting her work area. Supervisors Report, Parker App'x at 279-80; Investigation by Steve Point, Parker App'x at 281-82. After receiving R.Y.'s complaint, Point reassigned J.M. to the other side of the facility.

Over the lunch hour, J.M. told Coker about R.Y.'s complaint. While speaking to Coker, J.M. denied that he had grabbed R.Y.'s butt and claimed that he had bumped into her. At his deposition, Coker admitted that because he was working in a different area at the time, he is unable to contradict R.Y.'s claims. Coker doubted that R.Y.'s allegations were true but acknowledged that it would have been inappropriate for J.M. to grab R.Y.'s butt and that he understood why Parker would terminate J.M. if he had grabbed R.Y.'s butt.

Later on that same date, Point and J.M. discussed R.Y.'s allegations. J.M. denied that he had grabbed R.Y.'s butt and explained that he had been carrying boxes and bumped into R.Y. J.M. initially denied mouthing "I love you" to R.Y. but later admitted that he had done so. When asked whether he believed that J.M. had grabbed R.Y.'s butt, Point responded, "I would say yes, I did believe it." Point Deposition, Parker App'x at 256.

However, no one witnessed J.M. grab R.Y.'s butt. After discussing the matter with Odean, Point ended J.M.'s assignment with Parker.

That same date, J.M. called Coker shortly after Coker's shift ended at 3:30 p.m. and informed him that Parker had ended his assignment.

### E. Coker's Voicemail to R.Y.

At 4:02 p.m. on that same date, Coker called R.Y., but she did not answer. Coker returned to Parker and discussed R.Y.'s behavior with Point. Coker told Point that R.Y. had made sexual references and engaged in sexual conduct in the workplace. Coker informed Point that R.Y. commented about J.M.'s penis, including telling him to "whip it out," told people that J.M. was gay and made J.M. smell her armpit. Coker Deposition, Parker App'x at 83. Coker told Point that he felt R.Y. should have discussed this information with him when R.Y. filed the complaint against J.M.

After speaking with Point, Coker returned home and called R.Y. at 4:35 p.m. After R.Y. did not answer, Coker left the following voicemail, as transcribed by Tammy Seltrecht, Parker's human resources manager:

> Hey [R.Y.], um, it's (sorry???) to hear about [J.M.] but, um, I guess, I think you need to correct what you did. It's wrong what you did and it was just bad. Um, if you don't fix it I guess I'll have to talk to your husband about all your cheating and all your lying. I'm willing to go that far. So you better call Steve Point, or whatever you do, or I will be talking to [your husband] and I will tell him everything, EVERYTHING.

Coker Voicemail to R.Y., Parker App'x at 181. At his deposition, Coker admitted that the voicemail was referencing R.Y.'s sexual harassment complaint against J.M. Coker Deposition, Parker App'x at 77. Coker contended that the purpose of the voicemail was to get R.Y. to "do the right thing and tell the truth." *Id.* at 74. However, Coker confirmed that the voicemail did not contain the word "truth" and that he was

"threatening" to tell R.Y.'s husband about her cheating and lying unless she told Point the truth. *Id*. at 130-31.

### F. Coker's Termination

On April 18, 2012, R.Y. played the voicemail for Point. Point reported Coker's voicemail to Odean, and eventually Seltrecht became involved.

On that same date, Point and Coker discussed the voicemail and more of R.Y.'s behavior. Point told Coker that Parker has a retaliation policy, to not say anything further to R.Y. and to leave her alone. Coker Deposition, Parker App'x at 86. Coker then told Point that he saw R.Y. grab guys' butts, shake her boobs in front of guys, powder two employees' butts, take candy and "rub it on her tits in front of guys and shake her tits and rub it on her pussy." *Id*. at 84-85. After their conversation, Point escorted Coker off the property and sent him home with pay while Odean and Seltrecht investigated the incident.

Later that night, Seltrecht e-mailed her boss, Tom Emig, and explained the situation.[3] Seltrecht Deposition, Coker App'x at 84-85. At her deposition, Seltrecht stated that she wrote in the e-mail that "[t]he point is that [Coker] called [R.Y.] and left the threat AFTER . . . [Point] warned him of the zero tolerance for [r]etaliation." *Id*. at 86. Seltrecht also confirmed that the e-mail mentioned that "[Coker] is a minority." *Id*. at 90. Seltrecht stated that she included the information about Coker being a minority because Parker's legal department wants employee demographics in these situations. *Id*. Seltrecht could not confirm that the e-mail was also sent to Parker's legal department, but she stated that she treats Emig and the legal department as "one in the same." *Id*. at 91.

On April 19, 2012, Coker called Seltrecht, who told him that he was suspended for three days with pay pending an investigation.

---

[3] The court notes that the e-mail is not included in either parties' appendix. However, the e-mail is discussed in Seltrecht's deposition.

On April 20, 2012, Odean, with Seltrecht, Point, and another manager in the room, notified Coker that he was being terminated for violating the retaliation policy. Coker Deposition, Parker App'x at 90. At her deposition, Seltrecht initially stated that Coker was terminated for violating three company policies: (1) the Anti-Harassment/Nondiscrimination Policy ("Anti-Harassment Policy"), which has a provision for retaliation; (2) the Anti-Retaliation Policy; and (3) the Workplace Violence Policy. Seltrecht Deposition, Coker App'x at 91.

The Anti-Harassment Policy identifies conduct that is not tolerated and outlines the procedure an employee should use to report harassing or discriminatory conduct. The Anti-Harassment Policy states that "[n]o employee will be retaliated against for bringing such conduct to Parker's attention or for participating in any investigation of such conduct." 2011 Employee Handbook, Parker App'x at 167. Immediately following, in a new paragraph, the Anti-Harassment Policy states that "[a]ny manager, supervisor or team member who engages in such objectionable conduct[4] is subject to disciplinary action, up to and including termination." *Id*.

The Anti-Retaliation Policy states that "Parker . . . strictly prohibits any form of retaliation [by any employee] against an employee who in good faith makes a complaint . . . regarding any conduct that he or she reasonably believes to be in violation of Parker's

_____

[4] The Anti-Harassment Policy is ambiguous as to what "objectionable conduct" refers to. Throughout the Anti-Harassment Policy, "conduct" refers to sexually harassing or discriminatory conduct; however, the Anti-Harassment Policy also makes clear that no employee "will be retaliated against for bringing such conduct," presumably referring to harassing or discriminatory conduct, to Parker's attention. *Id*. A reading that the use of the term "objectionable conduct" in the penalty provision refers to retaliatory conduct, as well as sexually harassing or discriminatory conduct, is consistent with the Anti-Harassment Policy language, especially considering that the term in question immediately follows the reference to retaliation. However, regardless of whether "objectionable conduct" refers to retaliatory conduct, Parker had a legitimate reason for terminating Coker's employment, for the reasons discussed below.

Code of Conduct or policies." Anti-Retaliation Policy, Coker App'x at 49. The Anti-Retaliation Policy goes on to state that "[n]o employee should be . . . threatened . . . or retaliated against in any other manner as a result of his or her making a good faith complaint . . . that a Parker policy [or] the Code of Conduct . . . has been violated." *Id.* The Anti-Retaliation Policy notes that "Parker prohibits employees from being retaliated against even if their complaints are proven unfounded by an investigation, unless the employee knowingly made a false allegation, provided false or misleading information in the course of an investigation, or otherwise acted in bad faith." *Id.*

The Workplace Violence Policy states that "[a]ny acts or threats of violence will not be tolerated. Anyone engaging in violent behavior will be subject to discipline, up to and including discharge." Workplace Violence Policy, Coker App'x at 53. The Workplace Violence Policy defines violent behavior as including, *inter alia*, the following: "[p]hysically harming or threatening to harm an individual" and "[a]ny other conduct that a reasonable person would perceive as constituting a threat of violence." *Id.*

The record contains no contemporaneous account of the specific policy upon which Parker terminated Coker, and there is not any other documentation in the record of Coker's termination. However, in Seltrecht's deposition, she noted that in the e-mail to Emig, she wrote, "The point is that [Coker] called [R.Y.] and left the threat AFTER . . . [Point] warned him of the zero tolerance for [r]etaliation." Seltrecht Deposition, Coker App'x at 86. Similarly, on April 19, 2012, Point wrote that on April 18, 2012 he "became very concerned for [R.Y.]" after hearing the voicemail that Coker left her because he had "just stressed to [Coker] that Parker has a No Retaliation policy when addressing such issues." Supervisors Report, Parker App'x at 279. Coker also noted in his deposition that Odean told him he was being terminated for retaliation.

With respect to the specific policy pursuant to which Parker terminated Coker's employment, representatives from Parker provide different accounts. Seltrecht confirmed

that there is "no allegation of [Coker] harassing anyone." Seltrecht Deposition, Coker App'x at 92. Rather, Seltrecht agreed that "[t]he justification for the [use of the] [A]nti-[H]arassment [Policy] was that it had a provision for retaliation." *Id.* When showed the Anti-Retaliation Policy, Seltrecht confirmed that it was "one of the policies that [Coker] was terminated under," but, when asked specifically what provision of the policy Coker violated, she stated, "I'll be honest, I—I went by the Anti-Harassment Policy's provision because . . . [R.Y] made a claim for sexual harassment, and [Coker] left her a threatening message that said retract it or else." *Id.* at 92-93. When Seltrecht was asked to clarify whether she, in fact, relied on the Anti-Retaliation Policy, Seltrecht stated that "it's part of the process" and that Coker violated the provision of the Anti-Retaliation Policy that states that "[t]he Company strictly prohibits retaliation against any person by another employee . . . for . . . reporting harassment." *Id.* at 93-94. With regard to the Workplace Violence Policy, Seltrecht stated that Coker violated the provisions about "threatening to harm an individual" and "[a]ny other conduct that a reasonable person would perceive as constituting a threat." *Id.* at 97-98 (citing Workplace Violence Policy, Coker App'x at 53). Seltrecht admitted that the voicemail was not a "threat of violence," but Seltrecht also testified to the following:

> Q: Okay. Would you agree that Mr. Coker is actually—his conduct was not in violation of the Workplace Violence Policy?
> A: He's basically threatening to ruin her life.
> Q: But he's not threatening violence.
> A: Okay.
> Q: So you would agree that his conduct was not in violation of the Workplace Violence Policy?
> A: [R.Y.] felt that it was a threat.
> Q: Okay. What did you feel?
> A: She was so shaken up, how could I not believe her?
> Q: Did she feel it was a threat of violence, or a threat that her husband would find out that she had allegedly been cheating and lying to him?

A:  I guess both.  Apparently he already knew.

*Id*. at 98-99.

At Odean's deposition, he agreed that it was the Anti-Retaliation Policy that "Coker was terminated for being in violation of," and that Coker violated this policy when he left the voicemail for R.Y.  Odean Deposition, Parker App'x at 288-89.  Odean also agreed that he "felt that [R.Y.]'s complaint was . . . in good faith" and that the "voicemail was a threat against someone who made a good faith complaint."  *Id*. at 289.  When asked about the Anti-Retaliation Policy, Point stated that he considered Coker's voicemail to be in violation of that policy because it was threatening R.Y. for bringing a complaint to his attention.  Point Deposition, Coker App'x at 262-64.  Odean and Point did not mention the Anti-Harassment Policy or the Workplace Violence Policy with respect to why Parker terminated Coker's employment.

## G. Coker's Knowledge of Parker's Policies

At his deposition, Coker admitted that he received the Employee Handbook several times throughout his time at Parker.  On August 10, 2011, Coker received a copy and acknowledged receipt of Parker's 2011 Employee Handbook.  The 2011 Employee Handbook contains Parker's Anti-Harassment Policy.  Employee Handbook, Parker App'x at 166.  On that same date, Coker attended an ethics training course conducted by Seltrecht that covered discrimination, respect in the workplace, retaliation and other employment topics.

Coker agreed at his deposition that "if you engaged in retaliation against a co-worker who reports sexual harassment, you could be terminated" and that "you couldn't retaliate against employees who reported sexual harassment."  Coker Deposition, Parker App'x at 28-29.  Furthermore, Coker indicated that he did not need a policy to know that Parker would not tolerate retaliation against an employee who reported sexual harassment and that he could be terminated for retaliating against such employee.  *Id.*

### H. Coker's Complaint to Iowa Civil Rights Commission ("ICRC")

On May 29, 2012, Coker filed a complaint with the ICRC pursuant to Iowa Code section 216.16. The complaint listed Coker's previous positions at Parker, his work history and past discipline, his version of the events that led to his termination, other allegations of race and national origin discrimination, other employees he believed engaged in the same conduct yet were treated more favorably and why he felt race and national origin were a factor in Parker's decision to terminate his employment.

On October 10, 2012, the ICRC issued Coker a right-to-sue letter. The letter, attached to the Complaint, states that "[t]he Right-to-Sue Letter is not a finding by ICRC on the merits of the charge. ICRC will take no further actions in this matter." Complaint at 4 (emphasis omitted).

## VI. ANALYSIS

Coker brings claims against Parker for race and national origin discrimination under federal and state law.

### A. Title VII

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

In a claim based on discrimination under Title VII, "'a plaintiff may survive the defendant's motion for summary judgment in one of two ways. The first is by proof of direct evidence of discrimination.'" *Torgerson*, 643 F.3d at 1044 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)) (internal quotation marks omitted). "But if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he [or she] must avoid summary judgment by creating the requisite inference of unlawful

discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Id.* (quoting *Griffith*, 387 F.3d at 736) (internal quotation marks omitted).

Under the *McDonnell Douglas* framework, the plaintiff has the burden of establishing a *prima facie* case of discrimination by demonstrating that: "(1) [he or] she was a member of the protected group; (2) [he or] she was qualified to perform the job; (3) [he or] she suffered an adverse employment action; and (4) circumstances permit an inference of discrimination." *Bearden v. Int'l Paper Co.*, 529 F.3d 828, 831 (8th Cir. 2008).

If the plaintiff is able to establish a *prima facie* case, then the burden "shifts to the defendant to provide a legitimate, nondiscriminatory reason for its decision." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011). "If the defendant provides such a reason, the [rebuttable] presumption [of discrimination] disappears, and the burden shifts back to the plaintiff to show that the proffered reason was pretext for discrimination." *Id.*; *see also Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873-74 (8th Cir. 2010).

Since Coker does not offer direct evidence of discrimination,[5] his claim must be analyzed under the *McDonnell Douglas* burden-shifting framework. The court assumes, without deciding, that Coker has established a *prima facie* case of race and national origin discrimination. The court now turns to address the second and third steps of the *McDonnell Douglas* framework, that is, whether: (1) Parker has provided a legitimate, nondiscriminatory reason for Coker's termination; and (2) whether Coker has shown that the proffered reason is pretext for race or national origin discrimination.

---

[5] In the Brief in Support of the Resistance (docket no. 14-1), Coker does not argue that he has direct evidence of discrimination and the court finds that such evidence does not exist.

### 1. Legitimate, nondiscriminatory reason

#### a. Parties' arguments

Parker argues that even if Coker can establish a *prima facie* case of race or national origin discrimination, Parker has provided a legitimate, nondiscriminatory reason for Coker's termination: Coker retaliated against R.Y. for reporting that J.M. had sexually harassed her in violation of company policy.

Coker asserts that Parker "has failed to articulate a legitimate, nondiscriminatory reason for [his] termination." Brief in Support of the Resistance at 12. Coker argues that Seltrecht admitted that he did not violate the Workplace Violence Policy or the harassment provision of the Anti-Harassment Policy. Coker further argues that he could not have violated the Anti-Retaliation Policy because "[d]ue to the relationship he had with [R.Y.], the discussions he had with [J.M.], and his own observations of the two at work, [he], in good faith, reasonably believed that [R.Y.] had provided untruthful and misleading information." *Id.* at 13. Coker notes that the "Anti-Retaliation Policy has an exception providing that employee conduct in reaction to a claim of harassment which included false or misleading information is not prohibited." *Id.*

#### b. Applicable law

"The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Torgerson*, 643 F.3d at 1047 (quoting *Floyd v. State of Mo. Dep't of Soc. Servs., Div. Of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999)) (internal quotation marks omitted). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006) (quoting *Reeves*, 530 U.S. at 142) (internal quotation marks omitted). The Eighth Circuit Court of Appeals "ha[s] consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee." *Id.*

### c.    Application

Parker has articulated a legitimate, nondiscriminatory reason for its decision to terminate Coker. Parker offers evidence that the company terminated Coker's employment because he violated the retaliation provision of either the Anti-Harassment Policy or the Anti-Retaliation Policy when, by his own admission, he left a voicemail for R.Y. that threatened to tell her husband about her lying and cheating unless she went to Point "to correct what [she] did" and "fix" the situation involving J.M. Coker Voicemail to R.Y., Parker App'x at 181. Because the burden is one of production, not persuasion, and involves no credibility assessment, *see Twymon*, 462 F.3d at 935, Coker's arguments that he did not violate the cited policies are more appropriately analyzed under the pretext stage of the *McDonnell Douglas* framework. Therefore, the court finds that Parker has met its burden, which is not onerous, of producing a legitimate, nondiscriminatory reason for Coker's termination. *Torgerson*, 643 F.3d at 1047.

### 2.    Pretext

"[A] plaintiff may prove pretext by 'adducing enough admissible evidence to raise genuine doubt as to the legitimacy of [the defendant's] motive.'" *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 854 (8th Cir. 2012) (second alteration in original) (quoting *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 521 (8th Cir. 2010)). "To demonstrate pretext, the employee must show that the employer's proffered reason is 'unworthy of credence.'" *Ebersole v. Novo Nordisk, Inc.*, No. 13-2160, __ F.3d __, __, 2014 WL 3361160, at *5, (8th Cir. July 10, 2014) (quoting *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 867 (8th Cir. 2006)). The Eighth Circuit Court of Appeals has held that

> "[a] plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake*, 596 F.3d at 874. "We have observed that there are 'at least two routes' for demonstrating a material question of fact

as to pretext." *Anderson*, 606 F.3d at 521 (citing *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006)). "First, a plaintiff may succeed indirectly by showing the proffered explanation has no basis in fact. Second, a plaintiff can directly persuade the court that a prohibited reason more likely motivated the employer." *Id.* [(quoting *Wallace*, 442 F.3d at 1120) (internal quotation marks omitted)].

*Gibson*, 670 F.3d at 854.

### a. Was there a basis in fact for the proffered explanation?

Coker asserts that Parker "has failed to articulate a legitimate, nondiscriminatory reason for Coker's termination." Brief in Support of the Resistance at 12. Coker argues that Parker acknowledged that he did not violate one of the policies initially cited by Parker for his termination, the Workplace Violence Policy, and that there was no allegation of harassment under the Anti-Harassment Policy. Coker further argues that he could not have violated the Anti-Retaliation Policy because it "has an exception providing that employee conduct in reaction to a claim of harassment which included false or misleading information is not prohibited." *Id.* at 13.

Parker argues that Coker cannot demonstrate that its proffered explanation for Coker's termination has no basis in fact. Parker asserts that its management investigated the voicemail Coker left for R.Y. and determined that Coker violated company policy when he threatened to tell R.Y.'s husband about her lying and cheating if she did not fix the situation involving J.M. Furthermore, Parker asserts that Coker acknowledged that his voicemail was threatening and that he knew he could not retaliate against an employee who brought a sexual harassment complaint.

In this case, the member of Parker management responsible for investigating R.Y.'s complaint of sexual harassment, Point, believed her claim that J.M. sexually harassed her. Point stated that he could tell "[R.Y.] was very concerned" when she made her complaint. Point Deposition, Parker App'x at 254. Point's testimony further indicates that after

investigating R.Y.'s complaint by speaking with her, J.M. and other employees, he believed her claim that J.M. had grabbed her butt. Furthermore, there is no indication that the allegations Coker raised about R.Y. during his conversation with Point following J.M.'s termination convinced Point, or any of Parker's management, that R.Y.'s complaint was false.

Likewise, Parker honestly believed that Coker, against Parker's policies, retaliated against R.Y. for filing a sexual harassment complaint. The e-mail discussed during Seltrecht's deposition, which was circulated to Parker management, stated that Coker called R.Y. after he was warned by Point that Parker did not tolerate retaliation against employees who reported sexual harassment.[6] Furthermore, Odean, with Seltrecht, Point and another manager in the room, informed Coker that he was being terminated for retaliating against R.Y. for reporting sexual harassment.

The evidence in the record is not clear on which policy Parker based its decision to terminate Coker's employment. Seltrecht testified that she "went by the Anti-Harassment Policy's [retaliation] provision because . . . [R.Y.] made a claim for sexual harassment, and [Coker] left her a threatening message that said retract it or else." Seltrecht Deposition, Coker App'x at 93. That provision states that "[n]o employee will be retaliated against for bringing such conduct to Parker's attention or for participating in any investigation of such conduct." 2011 Employee Handbook, Parker App'x at 167. Immediately following such provision in the Anti-Harassment Policy is a penalty provision that states that "[a]ny manager, supervisor or team member who engages in such

_____

[6] Coker disputes that prior to him leaving the voicemail that Point warned him that Parker did not tolerate retaliation against employees who reported sexual harassment. Nonetheless, the content of the e-mail, that is, that Point warned Coker not to retaliate, formed a basis for Parker's decision to terminate Coker and, therefore, is evidence of whether there is a basis in fact for Parker's proffered legitimate, nondiscriminatory reason for terminating Coker's employment.

objectionable conduct is subject to disciplinary action, up to and including termination." *Id*. As discussed in footnote 4, it is unclear whether this penalty provision refers to retaliatory conduct, sexual harassment or discriminatory conduct. The Anti-Retaliation Policy, which was the policy violation that Odean and Point relied on, may have been the more appropriate policy under which to terminate Coker's employment, but the evidence in the record indicates that Parker believed that Coker violated its general prohibition of retaliation. Moreover, Seltrecht confirmed that "[i]f conduct was violative of the [retaliation provision of the Anti-Harassment Policy], it would be a violation of . . . the Anti-Retaliation Policy." Seltrecht Deposition, Parker App'x at 304.

Parker's proffered reason for terminating Coker, that is, that he retaliated against R.Y. for filing a sexual harassment complaint, "need not, in the end, be correct if [Parker] honestly believed the asserted grounds at the time of [Coker's] termination." *Twymon*, 462 F.3d at 935. While it is unclear whether Parker relied on the retaliation provision within the Anti-Harassment Policy or the Anti-Retaliation Policy, the evidence in the record clearly indicates that Parker management honestly believed that Coker violated a company policy by retaliating against an employee that reported sexual harassment.

### b. *Did a prohibited reason more likely motivate the employer?*

### I. *Parties' arguments*

Coker argues that "[e]ven if [Parker] can articulate a legitimate, nondiscriminatory reason for Coker's termination, Coker can establish that [Parker]'s reason was merely pretext for discrimination." Brief in Support of the Resistance at 14 (emphasis omitted). Coker argues that a prohibited reason more likely motivated Parker to terminate his employment for the following reasons: (1) similarly situated co-workers were treated more favorably by Parker; (2) Parker shifted its explanation for terminating Coker; and (3) Parker's conduct close in time to Coker's termination, including J.M.'s termination, Coker's discussion with Odean about the segregation of black workers at Parker and the

mention of Coker's race in the e-mail sent from Seltrecht to Emig, indicated that Coker's race or national origin were the reason for his termination. *Id.* at 14-17.

Parker argues that Coker cannot demonstrate that a prohibited reason more likely led to the decision to terminate his employment for the following reasons: (1) Parker's history of supporting Coker throughout his employment; (2) Coker's complaints about the radio station, safety vests, cell phone use and black employees not working together do not suggest a racial animus, are not actionable and are petty slights or minor annoyances that Title VII does not cover; (3) Coker has not demonstrated that similarly situated employees were treated more favorably; (4) Coker cannot prove pretext based on how J.M. was treated; (5) Parker has not shifted its explanation for Coker's termination; and (6) the e-mail sent from Seltrecht to Emig that mentions Coker's race only shows that Seltrecht made "an HR risk analysis concerning protected classes before proceeding with Coker's termination." Reply at 5. Accordingly, Parker asserts that Coker's claim should be dismissed because "Coker cannot show that [Parker]'s legitimate, non-discriminatory reason is pretext." Brief in Support of Motion at 15.

### ii. *Applicable law and application*

#### (1) *Comparators*

"At the pretext stage, 'the test for determining whether employees are similarly situated to a plaintiff is a rigorous one.'" *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012) (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005)). The plaintiff must establish that he and other employees outside of his protected class are "similarly situated in all relevant respects." *Id.* (quoting *Rodgers*, 417 F.3d at 853) (internal quotation marks omitted). "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (quoting *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000)) (alteration in original) (internal

quotation marks omitted). "[T]o be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness." *Id.* (quoting *Rodgers*, 417 F.3d at 853) (internal quotation marks omitted).

Coker claims that two employees outside of his protected class, that is, R.Y. and D.P., engaged in the same conduct without any mitigating circumstances. Seltrecht confirmed that R.Y. admitted to the following conduct: playing "you show me yours, I'll show you mine" with a male employee, being flirtatious, shaking baby powder down the pants of a male employee and having other inappropriate conversations while at work. Seltrecht Deposition, Coker App'x at 102-05. D.P. was accused of attempting to follow R.Y. into the restroom. Point Deposition, Coker App'x at 66.

In this case, the record reveals that neither R.Y. nor D.P. is an employee that is similarly situated to Coker. To be similarly situated to Coker, an employee would have to also have retaliated against a co-worker for reporting sexual harassment, or other, comparably serious misconduct. While R.Y.'s and D.P.'s behavior certainly constituted harassment, these employees neither engaged in the same conduct as Coker nor violated Parker's policies against retaliation. The evidence in the record does not identify that R.Y., D.P. or any other employee violated Parker's anti-retaliation policies, let alone that an employee who violated the policies was not terminated. Moreover, Seltrecht confirmed that, in her ten years at Parker, "there has never been a reported violation of [the Anti-Retaliation Policy]." Seltrecht Deposition, Parker App'x at 305. *See Twymon*, 462 F.3d at 936 (finding that plaintiff failed to identify valid comparators because he could not identify any admissible evidence regarding employer's treatment of employees who violated the same policy and, accordingly, holding that the plaintiff could not prove the defendant's proffered reason for terminating the employee was pretextual); *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 858 (8th Cir. 2004) (finding that employer was not required to treat two behaviors, both considered sexual horseplay, as substantially similar

because they involved objectively different conduct), *abrogated on other grounds by Torgerson*, 643 F.3d at 1031.

Moreover, Coker's disciplinary history is a "mitigating or distinguishing circumstance[]," *Bone*, 686 F.3d at 956, that prevents R.Y. and D.P. from being similarly situated to him. The evidence in the record does not indicate that either R.Y. or D.P. had a similar disciplinary history as Coker.[7] After the sexual harassment claim was filed against him in 2008, Coker was warned that he was "in a very serious and critical position relative to [his] continued employment at Parker." Decision-Making Time Off Notification, Parker App'x at 180. Odean confirmed that the sexual harassment complaint filed against Coker played a role in the decision to terminate Coker. Odean Deposition, Parker App'x at 286. As such, Coker's disciplinary record further prevents a finding that R.Y. and D.P. were similarly situated employees that received disparate treatment.

Furthermore, even if R.Y. and D.P's conduct was considered to be of "comparable seriousness," *Bone*, 686 F.3d at 956, to Coker's, Coker has not presented sufficient evidence to show that people outside of his protected class were treated differently than himself. Like R.Y. and D.P., Coker violated the sexual harassment policy in 2008. Also like R.Y. and D.P., Coker was given a second chance. Thus, Coker's suggestion that Parker treated employees of different races and national origins differently for the same conduct is inaccurate. Rather, Parker treated different *conduct* differently, as discussed above.

### (2)    *Shifting explanation*

"A change in an employer's legitimate, nondiscriminatory reason for firing an employee is probative of pretext only if the discrepancy is 'substantial.'" *Id.* at 957 (quoting *Twiggs v. Selig*, 679 F.3d 990, 994 (8th Cir. 2012)). "Where employers 'gave

---

[7] While R.Y. admitted to committing comparably serious misconduct, no one filed a formal complaint against her and she was not disciplined for committing such conduct.

two completely different explanations for their decisions to terminate their employees,' such a substantial change is established." *Twiggs*, 679 F.3d at 994 (quoting *EEOC v. Trans State Airlines, Inc.*, 462 F.3d 987, 995 (8th Cir. 2006)). "However, where the employer 'has not wavered from its one explanation for terminating' the employee, there is no substantial change." *Id.* (quoting *Trans State Airlines, Inc.*, 462 F.3d at 995).

There is no evidence in the record that Parker substantially shifted its explanation for Coker's termination. While the evidence is unclear under which policy Coker was terminated, each of Parker's explanations for Coker's termination revolve around the retaliatory voicemail that he left R.Y. The e-mail discussed in Seltrecht's deposition and Odean's statement when Coker was terminated demonstrate that the management of Parker terminated Coker because they honestly believed that Coker left R.Y. a retaliatory voicemail, in violation of Parker's policies, after she reported sexual harassment. Moreover, Seltrecht confirmed that any conduct that violated the provision against retaliation in the Anti-Harassment Policy would also violate the Anti-Retaliation Policy. The fact that Seltrecht also relied on the Workplace Violence Policy, even if incorrect, also resulted from Coker's voicemail that he left for R.Y. Because Parker's explanation for its decision to terminate Coker always focused on the same conduct, that is, Coker leaving R.Y. a threatening voicemail after she reported sexual harassment, Coker cannot establish that Parker "gave two completely different explanations" for its decision to terminate Coker or that there was a "substantial change" in Parker's explanations. *Twiggs*, 679 F.3d at 994.

### (3) *Other evidence of discrimination*

Coker's other evidence of discrimination does not demonstrate that a prohibited reason more likely led to Parker's decision to terminate him. First, Coker cannot rely on Parker's recent termination of J.M., a black employee, to demonstrate pretext. The evidence in the record demonstrates that Parker ended J.M.'s temporary contract because

he was accused of, and admitted to, inappropriate behavior while at work. Moreover, there is no evidence in the record that an employee ever filed a formal complaint that alleged another employee sexually touched someone like J.M. did when he credibly grabbed R.Y.'s butt. The record indicates that Parker's decision to terminate J.M.'s temporary employment contract was based solely on the independent finding that J.M. sexually harassed an employee by grabbing her butt.

Coker also alleges that he can show that Parker terminated his employment because of his race or national origin because Parker discriminated against him after he complained about the following: (1) the radio station not being rotated properly[8]; (2) Parker's cell phone policy not being applied equally to all employees; (3) Parker not requiring all employees to wear safety vests in the dock area of Parker's plant; and (4) Parker not scheduling black employees to work together.

Parker has presented legitimate reasons why the company made these decisions and "federal courts do not serve as 'super personnel departments,' sitting in judgment of an employer's business decisions absent evidence of discrimination." *Anderson*, 606 F.3d at 522 (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995)).

Coker was caught using his cell phone during work hours even though the Employee Handbook explicitly states that "[c]ell phones may only be used during breaks and lunch periods." Employee Handbook, Parker App'x at 168. Coker was required to wear his safety vest because he worked in an area where Parker requires all employees to wear a vest. Furthermore, during Coker's conversation with Odean, in which Coker complained about black employees not working together, Odean told Coker that he and Calvin, a black employee, were not scheduled to work together "[b]ecause you're always

---

[8] Coker's complaint about the radio station is a non-issue. Coker acknowledged that the radio station was not played in a discriminatory way and that his complaint about how the radio station was played did not have to do with race. Coker Deposition, Parker App'x at 91-93, 140-41.

talking together, and I don't know how much production you get done if you're in the exact same cell working together." Odean Deposition, Parker App'x at 270. Coker also confirmed that Parker had the right to "figure out what works the best at Parker as far as who works in what cell." Coker Deposition, Parker App'x at 148. Because there is no evidence in the record that Parker discriminated on the basis of race or national origin with respect to any of Coker's complaints, these complaints do not support Coker's contention that Parker's reason for terminating him was pretext and that the real reason for his termination was because of his race or national origin.

Neither does the e-mail Seltrecht sent to Emig prior to Coker's termination demonstrate that a prohibited reason more likely led to Parker's decision to terminate Coker. At her deposition, Seltrecht stated that the e-mail discussed Coker's race because Parker's legal department wants employee demographics when making personnel decisions. The evidence in the record does not show that Coker's race or national origin were discussed in any derogatory or distasteful manner, and it does not indicate that Coker's status as a minority played any role in the decision to end his employment. It is permissible for a legal team to request the race of an employee to determine if an employee is in a protected class so that it can properly evaluate the potential risk of litigation associated with terminating an employee belonging to a protected class.

Finally, the evidence in the record demonstrates that Parker had a strong history of supporting Coker throughout his employment. Coker received positive and negative reviews; received counselings and warnings for quality-related errors, attendance, wasting time, leaving the work area, having nonproductive conversations, not maintaining a consistent productivity level and striking a water fountain while operating a forklift; had a sexual harassment complaint filed against him; and violated the Workplace Violence Policy. Yet, Parker repeatedly allowed Coker to maintain his employment. Odean, who was directly involved in Coker's termination, had a good relationship with Coker inside

and outside of work. Coker felt comfortable enough to talk with Odean about his marital problems and Odean had previously allowed Coker to take an extra week off of work to visit his family in Africa. Parker's history of supporting Coker, despite many instances of unacceptable performance, and his relationship with Odean provide further evidence that Parker's decision to end Coker's employment was not motivated by Coker's race or national origin.

Coker's claim fails at step three of the *McDonnell Douglas* analysis because he has not produced "sufficient admissible evidence from which a rational factfinder could find that [Parker]'s proffered reason was false or not the real reason for its action, and that intentional discrimination was the real reason." *Bergstrom-Ek v. Best Oil Co.*, 153 F.3d 851, 857-58 (8th Cir. 1998). Here, "the evidence . . . is so one-sided that it does not present a sufficient disagreement to require submission to a jury." *Torgerson*, 643 F.3d at 1052. Accordingly, the court grants Parker's motion with respect to Coker's Title VII claim.

### B. ICRA Claim

The ICRA, like Title VII, makes it unlawful for an employer "to discharge any employee, or to otherwise discriminate in employment against . . . any employee because of the age, race, creed, color, sex, sexual orientation, gender identity, national origin, religion, or disability of such . . . employee." Iowa Code § 216.6(1)(a).

The Eighth Circuit has found that if the plaintiff has failed to present any separate arguments under the ICRA, then the federal courts may address the plaintiff's state civil rights claims together with his or her Title VII claims. *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir. 2003) (citing *Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n*, 322 N.W.2d 293, 296 (Iowa 1982)). This is because the Iowa Supreme Court has found that "[t]he ICRA was modeled after Title VII, and therefore [it has] consistently employed federal analysis when interpreting the ICRA." *Estate of Harris v.*

*Papa John's Pizza*, 679 N.W.2d 673, 677-78 (Iowa 2004) (citing *Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 803 (Iowa 2003)); *see also Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999).

With these principles in mind, the court finds that Coker has not presented any separate arguments under the ICRA and, therefore, the court addresses Coker's state claim in the same manner as his Title VII claim. Accordingly, for the reasons discussed above, the court grants Parker's motion with respect to Coker's ICRA claim.

## VII. CONCLUSION

In light of the foregoing, Parker Hannifin Corporation's Motion for Summary Judgment (docket no. 13) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Parker Hannifin Corporation and against Muctaru Coker and to **CLOSE THIS CASE**.

**IT IS SO ORDERED.**

**DATED** this 21st day of August, 2014.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA